# ORIGINAL

## IN THE COURT OF COMMON PLEAS
## HAMILTON COUNTY, OHIO
### CIVIL DIVISION

**VERONICA YEAKLE**　　　　　　　:　　　Case No.　　A 1 6 0 0 2 3 5
601 West State Street　　　　　　　:
Apartment #11　　　　　　　　　　:　　　JUDGE
Trenton, Ohio 45067　　　　　　　:

　　　　　　**Plaintiff,**　　　　　　:　　　**COMPLAINT**
**v.**　　　　　　　　　　　　　　:　　　**& JURY DEMAND**

**ABUBAKAR ATIQ DURRANI, M.D.**　:
Pakistan　　　　　　　　　　　　:
(Served via Hague Convention)　　　:
　　　　　　　　　　　　　　　　:　　　**(ALL NEW DR. DURRANI**
And　　　　　　　　　　　　　　:　　　**CASES SHALL GO TO JUDGE**
　　　　　　　　　　　　　　　　:　　　**RUEHLMAN PER HIS ORDER)**
**CENTER FOR ADVANCED SPINE**　　:
**TECHNOLOGIES, INC.**　　　　　　:
(Served via Hague Convention)　　　:

And　　　　　　　　　　　　　　:

**WEST CHESTER HOSPITAL, LLC**　　:
7700 UNIVERSITY DRIVE　　　　　:
WEST CHESTER, OH 45069　　　　:

SERVE: GH&R BUSINESS SVCS., INC.　:
511 WALNUT STREET　　　　　　:
1900 FIFTH THIRD CENTER　　　　: 　　　**REGULAR MAIL WAIVER**
CINCINNATI, OH 45202　　　　　:
(Serve via Certified mail)　　　　　:

And　　　　　　　　　　　　　　:

**UC HEALTH**　　　　　　　　　:
SERVE: GH&R BUSINESS SVCS., INC.　:
511 WALNUT STREET　　　　　　:
1900 FIFTH THIRD CENTER　　　　:
CINCINNATI, OH 45202　　　　　:　　　**REGULAR MAIL WAIVER**
(Serve via Certified mail)　　　　　:

　　　　　　**Defendants.**　　　　:





FILED
2016 JAN 14 P 12: 13
TRACY WINKLER
CLERK OF COURTS
HAMILTON COUNTY, OH

D113194235 INI

Comes now Plaintiff, Veronica Yeakle, and files this Complaint and jury demand and states as follows:

1.  At all times relevant, Plaintiff was a resident of and domiciled in the State of Ohio.

2.  At all times relevant, Defendant Dr. Abubakar Atiq Durrani (hereinafter "Dr. Durrani") was licensed to and did in fact practice medicine in the State of Ohio.

3.  At all times relevant, Center for Advanced Spine Technologies, Inc. (hereinafter "CAST"), was licensed to and did in fact perform medical services in the State of Ohio, and was and is a corporation authorized to transact business in the State of Ohio and Kentucky.

4.  At all times relevant, West Chester Hospital, LLC (hereinafter "West Chester Hospital"), was a limited liability company authorized to transact business and perform medical services in the State of Ohio and operate under the trade name West Chester Hospital.

5.  At all times relevant, Defendant UC Health Inc., was a duly licensed corporation which owned, operated and/or managed multiple hospitals including, but not limited to West Chester Hospital, and which shared certain services, profits, and liabilities of hospitals including West Chester.

6.  At all times relevant herein, West Chester Medical Center, Inc., aka West Chester Hospital held itself out to the public, and specifically to Plaintiff, as a hospital providing competent and qualified medical and nursing services, care and treatment by and through its physicians, physicians in training, residents, nurses, agents, ostensible agents, servants and/or employees.

7.  UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC.

8.  UC Health Stored BMP-2 at UC Health Business Center warehouse located in Hamilton County.

9.   UC Health is the corporate parent, owner and operator of West Chester Hospital, LLC. UC Health is located in Hamilton County making Hamilton County appropriate to bring this lawsuit.

10.  The subject matter of the Complaint arises out of medical treatment by Defendants in Hamilton County, Ohio.

11.  The amount in controversy exceeds the jurisdictional threshold of this Court.

12.  This case was previously set for trial and Plaintiff's 41(A) Voluntarily Dismissed this case and are now re-filing this case.

### FACTUAL ALLEGATIONS OF PLAINTIFF

13.   Around January of 2013, when Plaintiff's right leg began giving out, Plaintiff visited her primary care physician.

14.   At this visit, Plaintiff's primary care physician recommended she see a specialist.

15.   On February 9, 2013, Plaintiff fell at home and was taken to West Chester Hospital's emergency room via ambulance.

16.   Plaintiff saw Dr. Durrani and received a CT scan of her spine.  Dr. Durrani evaluated her and told her it was her back causing the leg issue.

17.   On or about February 15, 2013, is when Dr. Durrani performed emergency surgery on Plaintiff's spine.

18.   Specifically, during this emergency room admission, Dr. Durrani performed an L5-S1 Laminectom and Foraminal Decompression.

19.   Plaintiff was in the hospital for over one week, when she was transferred to a nursing home for rehabilitation and physical therapy.

20.   Plaintiff noticed the physical therapy only made her right leg more painful, giving her no relief.

21.    Plaintiff during her recovery period developed sores on her abdomen and umbilical area and later was tested positive for MRSA.

22.    Plaintiff stayed at the nursing home until about early June of 2013, when she was transferred home.

23.    Upon information and belief, around this time, Plaintiff visited Dr. Durrani, who gave her an epidural steroid injection.

24.    Plaintiff stopped treating with Dr. Durrani around the summer of 2013 because she felt Dr. Durrani did not help her and only made her pain worse.

25.    When Plaintiff's pain continued she began treating with a different Doctor.

26.    Plaintiff visited Dr. Albright at the Orthopedic and Sports Medicine Consultants, Inc. and was ultimately referred to the surgeon, Dr. Robert True, who stated she needed knee surgery.

27.    Upon information and belief, the surgery performed by Dr. Durrani was medically unnecessary and improperly performed.

28.    As a direct and proximate result of this surgery and Dr. Durrani's negligence, the Plaintiff has suffered harm.

## MORE SPECIFIC ALLEGATIONS BASED UPON DISCOVERY AND DEPOSITION TESTIMONY

29.    This information is to demonstrate the overall negligence and inappropriate actions of Dr. Durrani and the hospitals he worked with and/or for and/or in an individual capacity.

30.    Krissy Probst was Dr. Durrani's professional and personal assistant handling professional, academic, travel, surgery scheduling, his journals, his Boards, his credentialing, his personal affairs and his bills.

31.     Krissy Probst worked as Dr. Durrani's assistant for three years at Children's Hospital from 2006, 2007, and 2008.

32.     Krissy Probst reported Dr. Durrani to Sandy Singleton, the Business Director at Children's for his having an affair with Jamie Moor, his physician assistant.

33.     Krissy Probst resigned in 2008 from Dr. Durrani and remained working for three other surgeons in the Orthopedic Department.

34.     Krissy Probst worked in the Orthopedic Department for eleven years from 2002-2013. She retired in May, 2013.

35.     Krissy Probst confirmed Dr. Durrani claims being a Prince, when he is not.

36.     According to Krissy Probst, Dr. Crawford, an icon in pediatric orthopedics treated Dr. Durrani "like a son."

37.     According to Krissy Probst, Dr. Crawford, Chief of Orthopedics at Children's unconditionally supported Dr. Durrani no matter the issues and problems Dr. Durrani faced.

38.     Dr. Durrani's patient care at Children's Hospital dropped off considerably after Jamie Moor became his physician assistant and they began their affair.

39.     Dr. Durrani was the only orthopedic spine surgeon at Children's who would perform a dangerous high volume of surgeries.

40.     At Children's, Dr. Durrani would begin a surgery, leave and have fellows and residents complete a surgery or do the full surgery while he was in his office with Jamie Moor, his physician assistant for four or five hours.

41.     Children's Board and administration knew about Dr. Durrani doing too many surgeries and not properly doing the surgeries.  They did nothing.

42. Dr. Durrani argued to Children's administration when they complained to him that he made them money so Children's tolerated him and allowed him to do what he wanted.

43. Dr. Durrani, when told by Children's that Jamie Moor had to leave, told Children's that he would leave too.

44. Dr. Agabagi would do one spine patient a day at Children's because it takes normally eight hours for a full fusion.

45. Dr. Durrani would schedule two to three spine surgeries a day at Children's.

46. Dr. Durrani would repeatedly have the Business Director, Sandy Singleton, or OR Director allow him to add surgeries claiming they were emergencies when they were not.

47. Dr. Durrani would leave a spine surgery patient for four or five hours in the surgery suite under the care of fellows or residents, unsupervised and sit in his office and check on the surgery as he pleased.

48. Dr. Peter Stern did not like Dr. Durrani while Dr. Durrani was at Children's because he knew all about his patient safety risk issues. Yet, Dr. Stern supported, aided and abetted Dr. Durrani's arrival at West Chester. It defies comprehension, but was for one of the world's oldest motives—greed of money.

49. There is also a Dr. Peter Sturm, an orthopedic at Children's who also had no use for Dr. Durrani.

50. Dr. Durrani chose his own codes for Children's billing which he manipulated with the full knowledge of Children's Board and management.

51. Dr. Durrani was dating and living with Beth Garrett, a nursing school drop-out, with the full knowledge of his wife Shazia.

52.     Dr. Durrani was close with David Rattigan until David Rattigan pursued Jamie Moor and Dr. Durrani would not allow David Rattigan in the OR at Children's for a long time.

53.     Dr. Durrani, while claiming to have riches, does not. Dr. Durrani's wife's family paid for Dr. Durrani's education and it is her family with the significant wealth.

54.     Medtronics paid for Dr. Durrani's trips and paid him $10,000 fees for speaking or simply showing up at a spine conference.

55.     Krissy Probst's business director told her to save all Dr. Durrani related documents and information and she did.

56.     While doing research at Children's, Dr. Durrani would misstate facts regarding his research. Children's knew he did this.

57.     Dr. Durrani ended on such bad terms with Children's Hospital he was not allowed on the premises after his departure in December 2008, yet he performed a spine surgery there in February 2009.

58.     Eric J. Wall, MD was the Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

59.     Sandy Singleton, MBA was the Senior Business Director of Surgical Services Division of Pediatric Orthopedic Surgery when Dr. Durrani left Children's.

60.     On information and belief, Dr. Durrani used his relationships with Children's officials to purge his Children's file of all patient safety and legal issues which had occurred as part of his departure "deal" which Defendants hide with privilege.

## DR. DURRANI COUNTS:

### COUNT I: NEGLIGENCE

61. Defendant Dr. Durrani owed his patient, Plaintiff, the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

62. Defendant Dr. Durrani breached his duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, and improper follow-up care addressing a patient's concerns.

63. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care on the part of the Defendant Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

### COUNT II: BATTERY

64. Dr. Durrani committed battery against Plaintiff by performing a surgery that was unnecessary, contraindicated for Plaintiff's medical condition, and for which he did not properly obtain informed consent, inter alia, by using BMP-2, PureGen and/or Baxano in ways and for surgeries not approved by the FDA and medical community, and by the failure to provide this information to Plaintiff.

65. Plaintiff would not have agreed to the surgery if they knew the surgery was unnecessary, not approved by the FDA, and not indicated.

66. As a direct and proximate result of the aforementioned battery by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: LACK OF INFORMED CONSENT

67. The informed consent forms from Dr. Durrani and CAST which they required Plaintiff to sign failed to fully cover all the information necessary and required for the procedures and surgical procedures performed by Dr. Durrani. Dr. Durrani and CAST each required an informed consent release.

68. In addition, no one verbally informed Plaintiff of the information and risks required for informed consent at the time of or before Plaintiff's surgery.

69. Dr. Durrani failed to inform Plaintiff of material risks and dangers inherent or potentially involved with her surgery and procedures.

70. Had Plaintiff been appropriately informed of the need or lack of need for surgery and other procedures and the risks of the procedures, Plaintiff would not have undergone the surgery or procedures.

71. As a direct and proximate result of the lack of informed consent, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT IV: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

72. Dr. Durrani's conduct as described above was intentional and reckless.

73. It is outrageous and offends against the generally accepted standards of morality.

74. It was the proximate and actual cause of Plaintiff's psychological injuries, emotional injuries, mental anguish, suffering, and distress.

75. Plaintiff suffered severe distress and anguish so serious and of a nature that no reasonable man or woman would be expected to endure.

## COUNT V: FRAUD

76. Dr. Durrani informed the Plaintiff that Dr. Shanti would be performing Plaintiff's surgery, but upon information and belief, Dr. Durrani may have actually performed that surgery.

77. Dr. Durrani made material, false representations to Plaintiff and their insurance company related to Plaintiff's treatment including: stating the surgery was necessary, that Dr. Durrani "could fix" Plaintiff, that more conservative treatment was unnecessary and futile, that the surgery would be simple or was "no big deal", that Plaintiff would be walking normally within days after each surgery, that the procedures were medically necessary and accurately reported on the billing to the insurance company, that the surgery was successful, and that Plaintiff was medically stable and ready to be discharged.

78. Dr. Durrani also concealed the potential use of Infuse/BMP-2 and/or Puregen in Plaintiff's surgery, as well as other information, when he had a duty to disclose to Plaintiff his planned use of the same.

79. These misrepresentations and/or concealments were material to Plaintiff because they directly induced Plaintiff to undergo her surgery.

80. Dr. Durrani knew or should have known such representations were false, and/or made the misrepresentations with utter disregard and recklessness as to their truth that knowledge of their falsity may be inferred.

81. Dr. Durrani made the misrepresentations before, during and after the surgery with the intent of misleading Plaintiff and their insurance company into relying upon them. Specifically, the misrepresentations were made to induce payment by the insurance

company, without which Dr. Durrani would not have performed the surgery, and to induce Plaintiff to undergo the surgery without regard to medical necessity and only for the purpose of receiving payment.

82. The misrepresentations and/or concealments were made during Plaintiff's office visits at Dr. Durrani's CAST offices.

83. Plaintiff was justified in their reliance on the misrepresentations because a patient has a right to trust their doctor and that the facility is overseeing the doctor to ensure the patients of that doctor can trust the facility.

84. As a direct and proximate result of the aforementioned fraud, Plaintiff did undergo surgery which was paid for in whole or in part by their insurance company, and suffered all damages as requested in the Prayer for Relief.

## COUNT VI: SPOLIATION OF EVIDENCE

85. Dr. Durrani willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

86. Dr. Durrani spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

87. Dr. Durrani's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## CAST COUNTS:

## COUNT I: VICARIOUS LIABILITY

88. At all times relevant, Defendants Dr. Durrani and Dr. Shanti were agents and/or employees of CAST.

89. Dr. Durrani is in fact, the owner of CAST.

90. Defendants Dr. Durrani and Dr. Shanti were performing within the scope of their employment with CAST during the care and treatment of Plaintiff.

91. Defendant CAST is responsible for harm caused by acts of its employees for conduct that was within the scope of employment under the theory of respondeat superior.

92. Defendant CAST is vicariously liable for the acts of Defendants Dr. Durrani and Dr. Shanti alleged in this Complaint including all of the counts asserted against Dr. Durrani and Dr. Shanti directly.

93. As a direct and proximate result of Defendant CAST's acts and omissions, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT II: NEGLIGENT HIRING, RETENTION, AND SUPERVISION

94. CAST provided Dr. Durrani and Dr. Shanti, inter alia, financial support, control, medical facilities, billing and insurance payment support, staff support, medicines, and tangible items for use on patients.

95. CAST, Dr. Durrani, and Dr. Shanti participated in experiments using BMP-2 and/or Puregen bone graft on patients, including Plaintiff, without obtaining proper informed consent thereby causing harm to Plaintiff.

96. CAST breached its duty to Plaintiff, inter alia, by not supervising or controlling the actions of Dr. Durrani, Dr. Shanti, and the doctors, nurses, staff, and those with privileges, during the medical treatment of Plaintiff at CAST.

97. The Safe Medical Device Act required entities such as CAST to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

98. Such disregard for and violations of federal law represents strong evidence that CAST

negligently hired, retained, and supervised Dr. Durrani and Dr. Shanti.

99. As a direct and proximate result of the acts and omissions herein described, including but not limited to failure to properly supervise medical treatment by Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: SPOLIATION OF EVIDENCE

100.    CAST, through its agents and employees, willfully altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records, emails, billing records, paperwork and related evidence.

101.    CAST, through its agents and employees, spoiled evidence with knowledge that there was pending or probable litigation involving Plaintiff.

102.    CAST's conduct was designed to disrupt Plaintiff's potential and/or actual case, and did in fact and proximately cause disruption, damages and harm to Plaintiff.

## COUNT IV: OHIO CONSUMER SALES PROTECTION ACT

103.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq. exempts physicians, a transaction between a hospital and a patient/consumer is not clearly exempted.

104.    CAST's services rendered to Plaintiff constitute a "consumer transaction" as defined in ORC Section 1345.01(A).

105.    CAST omitted suppressed and concealed from Plaintiff facts with the intent that Plaintiff rely on these omissions, suppressions and concealments as set forth herein.

106.    CAST's misrepresentations, and its omissions, suppressions and concealments of fact, as described above, constituted unfair, deceptive and unconscionable acts and

practices in violation of O.R.C 1345.02 and 1345.03 and to Substantive Rules and case law.

107.  CAST was fully aware of its actions.

108.  CAST was fully aware that Plaintiff was induced by and relied upon CAST's representations at the time CAST was engaged by Plaintiff.

109.  Had Plaintiff been aware that CAST's representations as set forth above were untrue, Plaintiff would not have used the services of Defendants.

110.  CAST, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

111.  CAST's actions were not the result of any bona fide errors.

112.  As a result of CAST's unfair, deceptive and unconscionable acts and practices, Plaintiff has suffered and continues to suffer damages, which include, but are not limited to the following:

a.  Loss of money paid

b.  Severe aggravation and inconveniences

c.  Under O.R.C. 1345.01 Plaintiff is entitled to:

   i.  An order requiring that CAST restore to Plaintiff all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;

   ii.  All incidental and consequential damages incurred by Plaintiff;

   iii.  All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

### COUNT V: FRAUD

113. CAST sent out billing to Plaintiff's insurance company after the surgeries at WCH.

114. The exact dates these medical bills were sent out are reflected in those medical bills.

115. These bills constituted affirmative representations by CAST that the charges related to Plaintiff's surgeries were medically appropriate and properly documented.

116. The bills were sent with the knowledge of CAST that in fact Plaintiff's surgeries were not appropriately billed and documented and that the services rendered at West Chester Hospital associated with Dr. Durrani were not appropriate.

117. The bills sent by CAST to Plaintiff falsely represented that Plaintiff's surgeries were appropriately indicated, performed and medically necessary in contra-indication of the standard of care.

118. Plaintiff relied on the facility holding Dr. Durrani out as a surgeon and allowing him to perform surgeries at its health care facility as assurance the facility was overseeing Dr. Durrani, vouching for his surgical abilities, and further was appropriately billing Plaintiff for CAST's services in association with Dr. Durrani's surgery.

119. As a direct and proximate result of this reliance on the billing of CAST, Plaintiff incurred medical bills that she otherwise would not have incurred.

120. CAST also either concealed from Plaintiff that they knew about Dr. Durrani, including that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's surgeries, or misrepresented to Plaintiff the nature of the surgeries, and the particular risks that were involved therein.

121.     CAST's concealments and misrepresentations regarding Infuse/BMP-2 and/or Puregen and the nature and risks of Plaintiff's surgeries were material facts.

122.     Because of its superior position and professional role as a medical service provider, CAST had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

123.     CAST intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgeries, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at WCH.

124.     Plaintiff is still awaiting itemized billing from CAST reflecting the exact totals charged for the use of Infuse-BMP-2 on Plaintiff.

125.     Had Plaintiff known before Plaintiff's surgeries that Infuse/BMP-2 and/or Puregen would be used in Plaintiff's spine and informed of the specific, harmful risks flowing therefrom, Plaintiff would not have undergone the surgery with Dr. Durrani at West Chester Hospital.

126.     Upon information and belief, Plaintiff believes the bills requested by Plaintiff will indicate that CAST falsely represented that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

127.     Plaintiff is still awaiting billing from CAST reflecting the exact totals charged for the use of BMP-2 on Plaintiff.

128.     As a direct and proximate result of the fraud against plaintiff by CAST, Plaintiff sustained all damages requested in the prayer for relief.

## WEST CHESTER HOSPITAL/UC HEALTH COUNTS:

### COUNT I: NEGLIGENCE

129. West Chester Hospital/UC Health owed their patient, Plaintiff, through its agents and employees the duty to exercise the degree of skill, care, and diligence an ordinarily prudent health care provider would have exercised under like or similar circumstances.

130. West Chester Hospital/UC Health acting through its agents and employees breached their duty by failing to exercise the requisite degree of skill, care and diligence that an ordinarily prudent health care provider would have exercised under same or similar circumstances through, among other things, negligent diagnosis, medical mismanagement and mistreatment of Plaintiff, including but not limited to improper selection for surgery, improper performance of the surgery, improper assistance during Plaintiff's surgery and improper follow up care addressing a patient's concerns.

131. The agents and employees who deviated from the standard of care include nurses, physician assistants, residents and other hospital personnel who participated in Plaintiff's surgery.

132. The management, employees, nurses, technicians, agents and all staff during the scope of their employment and/or agency of West Chester Hospital/UC Health's knowledge and approval, either knew or should have known the surgery was not medically necessary based upon Dr. Durrani's known practices; the pre-op radiology; the pre-op evaluation and assessment; and the violation of their responsibility under the bylaws, rules, regulations and policies of West Chester Hospital/UC Health.

133. As a direct and proximate result of the aforementioned negligence and deviation from the standard of care by the agents and employees of West Chester Hospital/UC Health,

Plaintiff sustained all damages requested in the Prayer for Relief.

**COUNT II: NEGLIGENT CREDENTIALING, SUPERVISION, AND RETENTION**

134.     As described in the Counts asserted directly against Dr. Durrani, the actions of Dr. Durrani with respect to Plaintiff constitute medical negligence, lack of informed consent, battery, and fraud.

135.     West Chester Hospital/UC Health negligently credentialed, supervised, and retained Dr. Durrani as a credentialed physician, violating their bylaws and JCAHO rules by:

    a.  Allowing Dr. Durrani to repeatedly violate the West Chester Hospital/UC Health bylaws with it's full knowledge of the same;

    b.  Failing to adequately review, look into, and otherwise investigate Dr. Durrani's educational background, work history and peer reviews when he applied for and reapplied for privileges at West Chester Hospital;

    c.  Ignoring complaints about Dr. Durrani's treatment of patients reported to it by West Chester Hospital staff, doctors, Dr. Durrani's patients and by others;

    d.  Ignoring information they knew or should have known pertaining to Dr. Durrani's previous privileged time at other Cincinnati area hospitals, including Children's Hospital, University Hospital, Deaconess Hospital, Good Samaritan Hospital and Christ Hospital.

136.  The Safe Medical Device Act required entities such as West Chester Hospital/UC Health to report serious injuries, serious illnesses, and deaths related to failed medical devices to the FDA and the manufacturer; this was never done.

137.  As a direct and proximate result of the negligent credentialing, supervision, and retention of Dr. Durrani, Plaintiff sustained all damages requested in the Prayer for Relief.

## COUNT III: FRAUD

138.    Plaintiffs incorporates each and every factual allegation pled in all prior paragraphs.

139.    Upon information and belief, Plaintiff believes the bills requested by Plaintiff will indicate that WCH falsely represented that Plaintiff's surgery was appropriately indicated, performed, and medically necessary in contra-indication of the standard of care.

140.    Defendants concealed from Plaintiffs facts they knew about Dr. Durrani and made misrepresentations to Plaintiffs as detailed in this Complaint as fully detailed in the paragraphs of this Complaint.

141.    Defendant's concealments and misrepresentations were material facts.

142.    Defendants had a duty to disclose these material facts to Plaintiffs and a duty to refrain from misrepresenting such material facts to Plaintiffs.

143.    Defendants intentionally concealed and/or misrepresented material facts with the intent to defraud Plaintiffs in order to induce Plaintiffs to undergo the surgery or cause them not to decide to cancel surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiffs at West Chester Hospital/UC Health.

144.    West Chester Hospital/UC Health either concealed from Plaintiff facts they knew about Dr. Durrani, including that West Chester Hospital/UC Health's concealments and misrepresentations regarding the nature and risks of Plaintiff's surgeries were material facts.

145.     Because of its superior position and professional role as a medical service provider, West Chester Hospital/UC Health had a duty to disclose these material facts to Plaintiff and a duty to refrain from misrepresenting such material facts to Plaintiff.

146.     West Chester Hospital/UC Health intentionally concealed and/or misrepresented said material facts with the intent to defraud Plaintiff in order to induce Plaintiff to undergo the surgery, and thereby profited from the surgeries and procedures Dr. Durrani performed on Plaintiff at West Chester Hospital/UC Health.

147.     According to Dr. Peter Stern, he knew Dr. Durrani was only "satisfactory" and not a world class surgeon as West Chester advertised.

148.     According to Jill Stegman, the risk manager at West Chester, she and others knew Dr. Durrani had "issues".

149.     According to former nursing manager, Elaine Kunko, West Chester Hospital knew about Dr. Durrani not completing records and claiming surgeries were emergencies when they were not.

150.     Had Plaintiffs known, before surgeries, that surgery was unnecessary, Plaintiffs would not have undergone the surgeries with Dr. Durrani at West Chester Hospital/UC Health.

151.     Plaintiff is still awaiting itemized billing from WCH reflecting the exact totals charged for the use of BMP-2 on Plaintiff.

152.     As a direct and proximate result of the fraud upon Plaintiffs by Defendants, Plaintiffs sustained all damages requested in the prayer for relief.

## COUNT IV: SPOLIATION OF EVIDENCE

153.    West Chester Hospital/UC Health through its agents and employees, willfully

altered, destroyed, delayed, hid, modified and/or spoiled ("spoiled") Plaintiff's records,

emails, billing records, paperwork and related evidence.

154.    West Chester Hospital/UC Health through its agents and employees, spoiled

evidence with knowledge that there was pending or probable litigation involving

Plaintiff.

155.    West Chester Hospital/UC Health's conduct was designed to disrupt Plaintiff's

potential and/or actual case, and did in fact and proximately cause disruption, damages

and harm to Plaintiff.

## COUNT V: OHIO CONSUMER SALES PROTECTION ACT

156.    Although the Ohio Consumer Sales Protection statutes O.R.C 1345.01 et seq.

exempts physicians, a transaction between a hospital and a patient/consumer is not

clearly exempted.

157.    West Chester Hospital/UC Health's services rendered to Plaintiff constitute a

"consumer transaction" as defined in ORC Section 1345.01(A).

158.    West Chester Hospital/UC Health omitted suppressed and concealed from

Plaintiff facts with the intent that Plaintiff rely on these omissions, suppressions and

concealments as set forth herein.

159.    West Chester Hospital/UC Health's misrepresentations, and its omissions,

suppressions and concealments of fact, as described above, constituted unfair, deceptive

and unconscionable acts and practices in violation of O.R.C 1345.02 and 1345.03 and to

Substantive Rules and case law.

160.     West Chester Hospital/UC Health was fully aware of its actions.

161.     West Chester Hospital/UC Health was fully aware that Plaintiff was induced by and relied upon West Chester Hospital/UC Health's representations at the time West Chester Hospital/UC Health was engaged by Plaintiff.

162.     Had Plaintiff been aware that West Chester Hospital/UC Health's representations as set forth above were untrue, Plaintiff would not have used the services of Defendants.

163.     West Chester Hospital/UC Health, through its agency and employees knowingly committed the unfair, deceptive and/or unconscionable acts and practices described above.

164.     West Chester Hospital/UC Health 's actions were not the result of any bona fide errors.

165.     As a result of West Chester Hospital/UC Health's unfair, deceptive and unconscionable acts and practices, Plaintiff has suffered and continues to suffer damages, which include, but are not limited to the following:

   a.     Loss of money paid

   b.     Severe aggravation and inconveniences

   c.     Under O.R.C. 1345.01 Plaintiff is entitled to:

      i.     An order requiring West Chester Hospital/UC Health restore to Plaintiff all money received from Plaintiff plus three times actual damages and/or actual/statutory damages for each violation;

      ii.     All incidental and consequential damages incurred by Plaintiff;

      iii.     All reasonable attorneys' fees, witness fees, court costs and other fees incurred;

## COUNT VI: PRODUCTS LIABILITY

166.    At all times Infuse/BMP-2 and Puregen are and were products as defined in R.C. § 2307.71(A)(12) and applicable law.

167.    Defendant (aka supplier) supplied either Medtronic's (aka manufacturer) Infuse/BMP-2 or Alphatec Spine's (aka manufacturer) Puregen for surgery performed by Dr. Durrani on Plaintiff.

168.    Defendant, as a supplier, failed to maintain either Infuse/BMP-2 or Puregen properly.

169.    Defendant did not adequately supply all components required to use either Infuse/BMP-2 or Puregen properly.

170.    Defendant knew or should have known the FDA requirements and Medtronic's requirements for using either Infuse/BMP-2 or Puregen.

171.    Defendant stored either Infuse/BMP-2 or Puregen at its facility.

172.    Defendant ordered either Infuse/BMP-2 or Puregen for surgery performed by Durrani.

173.    Defendant did not adequately warn Plaintiff that either Infuse/BMP-2 or Puregen would be used without all FDA and manufacturer required components.

174.    Defendant did not gain informed consent from Plaintiff for the use of either Infuse/BMP-2 or Puregen, let alone warn of the supplying of the product without FDA and manufacturer requirements.

175.    Defendant intentionally billed Infuse/BMP-2 and/or Puregen as "Miscellaneous" to prevent the discovery of the use of Infuse/BMP and/or Puregen by Plaintiff.

176. Defendant failed to supply either Infuse/BMP-2 or Puregen (aka product) in the manner in which it was represented.

177. Defendant failed to provide any warning or instruction in regard to either Infuse/BMP-2 or Puregen, and failed to make sure any other party gave such warning or instruction.

178. Plaintiff suffered physical, financial, and emotional harm due to Defendant's violation of the Ohio Products Liability act. Plaintiff's injuries were a foreseeable risk

179. Plaintiff did not alter, modify or change the product, nor did Plaintiff know that the product was being implanted without all required components.

180. Defendant knew or should have known that the product was extremely dangerous and should have exercised care to provide a warning that the product was being used and that the product was being used outside FDA and manufacturer requirements. The harm caused to Plaintiff by not providing an adequate warning was foreseeable,

181. Defendant knew that the product did not conform to the representation of the intended use by the manufacturer yet permitted the product to be implanted into Plaintiff.

182. Defendant, as a supplier, acted in an unconscionable manner in failing to supply the product without all FDA and manufacturer required components.

183. Defendant, as a supplier, acted in an unconscionable manner in failing to warn Plaintiff that the product was being supplied without all FDA and manufacturer required components.

184. Defendant's actions demonstrate they took advantage of the Plaintiffs inability, due to ignorance of the product, to understand the product being implanted without FDA and manufacturer required components.

185.    Defendant substantially benefited financially by the use of the product as the product allowed for Defendant to charge more for the surgery.

186.    Plaintiff suffered economic loss as defined in R.C. § 2303.71(A)(2) and applicable law.

187.    Plaintiff suffered mental and physical harm due to Defendant's acts and omissions.

188.    Plaintiff suffered emotional distress due to acts and omissions of Defendant and is entitled to recovery as defined in R.C. § 2307.71(A)(7) and applicable law.

189.    Defendant violated the Ohio Products Liability Act R.C. § 2307.71-2307.80

190.    Defendant violated R.C. § 2307.71(A)(6)

191.    Defendant violated The Ohio Consumer Sales Practices Act R.C. § 1345.02-.03.

192.    Defendant provided inadequate warnings are defined in R.C, § 2307.76(A) and applicable law.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff requests and seeks justice in the form and procedure of a jury, verdict and judgment against Defendants on all claims for the following damages:

1.  Past medical bills;

2.  Future medical bills;

3.  Lost income and benefits;

4.  Lost future income and benefits;

5.  Loss of ability to earn income;

6.  Past pain and suffering;

7.  Future pain and suffering;

8.  Plaintiff seeks a finding that their injuries are catastrophic under Ohio Rev. Code §2315.18;

9. Plaintiff seeks all relief available under the Ohio Products Liability Act R.C. § 2307.71-2307.80 and applicable law;

10. All incidental costs and expenses incurred as a result of their injuries;

11. The damages to their credit as a result of their injuries;

12. Punitive damages;

13. Costs;

14. Attorneys' fees;

15. Interest;

16. All property loss;

17. All other relief to which they are entitled including O.R.C. 1345.01

Based upon 1-16 itemization of damages, the damages sought exceed the minimum jurisdictional amount of this Court and Plaintiff seeks in excess of $25,000.

Respectfully Submitted,

Matthew Hammer (0092483)
Lindsay Boese (0091307)
*Attorneys for Plaintiff*
5247 Madison Pike
Independence, KY 41051
Phone: 513-729-1999
Fax: 513-381-4084
mhammer@ericdeters.com

## JURY DEMAND

Plaintiffs make a demand for a jury under all claims.

Matthew Hammer (0092483)
Lindsay L. Boese (0091307)

### AFFIDAVIT OF MERIT
### FOR VERONICA YEAKLE

I, Andrew Collier, MD, after being duly sworn and cautioned state as follows:

1. I have made a preliminary review of all relevant medical records and other information provided to me regarding the above named patient concerning the allegations in her lawsuit filed or to be filed. (I'm fully aware of the lawsuits and claims being filed in what is referred to as the Durrani litigation.)

2. Based upon my preliminary review of the medical records and other information provided to me, my education, training and experience, it is my opinion, based upon a reasonable degree of medical probability that the Defendants, Dr. Durrani, CAST and West Chester Medical Center deviated from the standard of care for the care and treatment of the above named patient, including lack of informed consent, and that deviation proximately caused harm and damages to the above named patient.

3. I devote at least one half of my professional time to the active clinical practice in my field of licensure, or its instruction to an accredited school.

4. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

5. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

6. The facts support the patient's claim for negligence, battery, lack of consent and fraud.

7. As a result of the negligence and conduct, the patient suffered damages proximately caused by them, including the following:

   A. Permanent disability
   B. Physical deformity and scars
   C. Past, Current and Future Physical and Mental Pain and Suffering
   D. Lost income past, present and future
   E. Loss of enjoyment of life
   F. Past medical expenses
   G. Future medical expenses approximately in the amount of $50,000 to $250,000 depending on course of treatment
   H. Aggravation of a pre-existing condition
   I. Decreased ability to earn income

AFFIANT SAYETH FURTHER NOT

_____
ANDREW COLLIER, M.D.

NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by Andrew

Collier, M.D. on this ___16___ day of _October_____, 2015.

_____
NOTARY PUBLIC
My Commission Exp.: 11/27/18
Burlington County
State of New Jersey

KATHLEEN A. COLLIER
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 11/27/2018

## AFFIDAVIT OF MERIT
## FOR STAGE II WEST CHESTER CLAIMS

I, Keith D. Wilkey, M.D., after being duly sworn and cautioned states as follows:

1. I devote at least one-half of my professional time to the active clinical practice in my field of licensure, or its instruction in an accredited school. I am an orthopedic surgeon whose focus is on spine surgery and treatment of those with spine issues.

2. I will supplement this affidavit with another, by a letter or by testimony, based upon any information provided to me after I execute it.

3. My curriculum vitae has been previously provided to opposing counsel in these Dr. Durrani cases and can be provided again upon request. For my review, I rely upon my education, training and experience.

4. I have not counted but I have reviewed, over 300 or more cases involving Dr. Durrani and the hospitals where he once had privileges.

5. I base my opinions in part on my review of all the cases I have reviewed which have revealed similar conduct by Dr. Durrani and the hospitals where he had privileges.

6. I am familiar with applicable standard of care for Ohio, Kentucky and the country for an orthopedic/spine surgeon such as Dr. Durrani.

7. I am also familiar with applicable standard of care, policies, rules and regulations, medical executive committee bylaws, JCAHO requirements, credentialing, supervising, retention of medical staff, granting and rejecting privileges and the peer review process for West Chester Hospital, LLC, also referred to as West Chester Hospital or West Chester Medical Center and UC Health.

8. I have reviewed the Response to Summary Judgment in the Brenda Shell case and all the exhibits attached to it.

9. The Center for Advanced Spine Technologies, Inc. was Dr. Durrani's practice group and he was the sole owner, director and officer of CAST as well as an employee. CAST as such is also responsible for Dr. Durrani's negligence and for their failure to also supervise, discipline and retain Dr. Durrani.

10. Based upon my review of the deposition testimony, the JCAHO requirements, the MEC bylaws and all the information provided to me, I am able to adopt the following opinions relating to WCMC and UC Health pertaining to the claims against them. WCMC's and UC Health's actions and inactions detailed in this affidavit proximately caused harm to Plaintiff. WCMC and UC Health are both being referenced when only WCMC is named. I hold the following opinions relative to WCMC and UC Health pertaining to their conduct acting through their

1

administration and MEC. The time period covered is from the time Dr. Durrani sought privileges prior to WCMC opening in May 2009 through May 2013 when he no longer had privileges. In addition to my opinions, I set forth facts I rely upon. This includes all which I referenced that I reviewed. In addition to all of the above, I attest to the following:

## FACTS

1. According to West Chester's first Executive Vice President, Carol King, she did not explore the "rumors" about Dr. Durrani's leaving Children's.

2. According to Carol King, the hospital tracked problem issues yet WCMC have failed to produce the information under peer review protection.

3. According to circulating nurse, Janet Smith, presets were changed in the computer to indicate the procedure Dr. Durrani performed after the procedure.

4. According to Janet Smith, despite no one at West Chester never working with Dr. Durrani before, WCMC never checked him out.

5. According to former University Hospital President (a UC Health hospital), Brian Gibler, hospitals face financial challenges.

6. According to risk manager, David Schwallie, risk management knew Durrani had issues.

7. According to radiologist, Thomas Brown, there were surgeons questioning Durrani's decisions to perform surgery.

8. According to medical staff director, Paula Hawk, a policy called "stop the lying" was implemented the same year and month they kicked out Dr. Durrani. This infers a poor environment of honesty and disclosure before this policy.

9. According to Paula Hawk and as the director of medical staff, money is not supposed to trump patient safety.

10. According to Paula Hawk, she admits peer review is for hospitals to protect each other.

11. According to Paula Hawk, she admits hospitals are interested in volume, something Dr. Durrani provided for WCMC and UC Health.

12. According to Mike Jeffers, the director of finance, they tracked Dr. Durrani's financial numbers.

2

13. According to Mike Jeffers, he admits Dr. Durrani helped them in their time of need.

14. According to Mike Jeffers, Dr. Durrani was the highest money generator.

15. According to Mike Jeffers, he knew Dr. Durrani had more than one surgical suite assigned at once.

16. According to Mike Jeffers, bonuses were paid to him and others based upon finances.

17. According to Dr. Peter Stern, he knew Dr. Durrani was only "satisfactory," not a world class spine surgeon as West Chester advertised.

18. Dr. Stern doesn't deny admitting UC Health looked the other way on Durrani because of money.

19. According to credentialing manager, Ann Shelly, there was plenty of "public knowledge" about Dr. Durrani to check before credentialing.

20. According to Ann Shelly, West Chester relied on the NPDB they knew was protected by hospitals.

21. Dr. Eric Schneeberger, Dr. Durrani's partner, was on the MEC at WCMC.

22. According to Eric Schneeberger, West Chester knew about Durrani scheduling surgeries long into the day and night.

23. According to former nursing manager, Elaine Kunko, WCMC knew about Dr. Durrani not completing records.

24. According to Elaine Kunko, WCMC knew Dr. Durrani would claim surgeries were emergency when they were not.

25. According to Elaine Kunko, WCMC knew there was an issue with Dr. Durrani not being in the room doing surgery on "his" patient.

26. According to Elaine Kunko, even the OR nurses knew WCMC put up with Dr. Durrani for money.

27. According to Elaine Kunko, WCMC tracked Dr. Durrani's financial numbers.

28. According to perioperative director, Lisa Davis, WCMC knew Durrani's office is supposed to get consents so WCMC had an obligation to make sure they did.

3

29. According to Jill Stegman, the risk manager at West Chester, she knew Durrani had "issues."

30. Jill Stegman confirms Gerry Goodman's complaints.

31. According to Kathy Hays, WCMC knew how Dr. Durrani used BMP-2 and PureGen.

32. Dr. Tim Kremchek, the Chief of the Orthopedic department, failed to do his job under the MEC bylaws as it related to the supervision and review of Dr. Durrani.

33. According to Dr. Tim Kremchek, he knew Dr. Durrani was "sloppy."

34. Kevin Joseph, the CEO of WCMC, claims to know nothing about surgery operations in his hospital.

35. Kevin Joseph, the CEO, claims a hospital must protect patients from unnecessary harm "as much as they can."

36. Kevin Joseph, the CEO, claims WCMC doesn't have oversight of surgeons doing what Plaintiff claims Durrani was doing. (Despite what his bylaws state.)

37. Kevin Joseph, the CEO, denies the hospital has any responsibility if Dr. Durrani did an unnecessary surgery.

38. Kevin Joseph, the CEO, despite his finance office tracking it, denies any knowledge of BMP-2 use.

39. Kevin Joseph, the CEO, denies knowing about any complaints about Dr. Durrani.

40. Kevin Joseph, the CEO, admits they benefited financially from Dr. Durrani, including his own pay.

41. Mark Tromba, the OR manager, admits BMP-2 use as used by Dr. Durrani.

42. According to Jeff Drapalik, the Senior Leadership team, including Joseph, met weekly and reviewed numbers.

43. According to Jeff Drapalik, the CFO of WCMC knew Dr. Durrani was a high volume money maker.

4

44. Lesley Gilbertson, a member of the MEC of WCMC, and anesthesiologist working with Durrani, had a concern about how long Durrani kept patients under.

45. According to materials manager, Dennis Robb, WCMC knew the volumes of BMP-2 being used.

46. According to Karen Ghaffari, WCMC knew the chart documentation of Dr. Durrani was not in compliance with their bylaws.

47. Patrick Baker, nursing VP at WCMC admits WCMC tracked the financial performance of Dr. Durrani.

48. According to nurse, Vicki Scott, the administration of WCMC knew from the outset of West Chester all the serious issues pertaining to Dr. Durrani.

49. According to Vicki Scott, West Chester's risk manager began to ignore complaints from Ms. Scott.

50. According to Vicki Scott, staff was scared to speak out.

51. According to Vicki Scott, patients didn't know who did the surgeries—Shanti or Durrani.

52. According to Vicki Scott, records were not accurate who was in the OR at what time.

53. According to Vicki Scott, everyone at WCMC knew it was about money.

54. According to Vicki Scott, WCMC knew about Dr. Durrani's and West Chester's illegal use of PureGen.

55. According to Vicki Scott, Dr. Durrani was a behavior problem.

56. According to patient representative, Elizabeth Dean, WCMC tracked Dr. Durrani's volumes from the outset and the CFO loved what he saw.

57. According to Elizabeth Dean, WCMC knew Dr. Durrani had issues at Children's.

58. According to Elizabeth Dean, WCMC knew Dr. Durrani was performing unnecessary procedures by volumes and repeats.

59. According to nurse, Scott Rimer, WCMC knew Dr. Durrani waited until after surgeries to document what procedures were planned.

5

60. According to Scott Rimer, patients at WCMC had procedures they did not consent to and WCMC knew it.

61. According to Scott Rimer, sterile fields were not protected.

62. According to Scott Rimer, WCMC knew PureGen was being used by Dr. Durrani and allowed it.

63. According to Thomas Blank, PureGen was an alternative to BMP-2, which WCMC turned to based upon insurance denials of BMP-2. In addition, Dr. Durrani operated an unethical POD of Alphatech called Evolution Medical to sell PureGen to West Chester.

64. According to Gerry Goodman, WCMC tracked BMP-2 use by Dr. Durrani; patients did not know who at times performed their surgery Dr. Shanti or Dr. Durrani; electronic records had to be changed after Dr. Durrani's surgery; Dr. Durrani and WCMC never obtained informed consents; Dr. Durrani's volume was a warning sign of overutilization. Gerry Goodman reported all these concerns to WCMC and there was no action. Gerry Goodman was told and concluded that WCMC did not want to do anything about Dr. Durrani because of money rewards.

## ADDITIONAL OPINIONS

65. The Center of Advanced Spine Technologies (CAST) negligently supervised and retained Dr. Durrani, including by allowing Dr. Durrani to perform unnecessary procedures and surgeries; use BMP-2 and/or PureGen without appropriate consent; failing to disclose Dr. Shanti and others involvement in surgery; improper billing; changing the pre-op and post-op records to coincide when the surgery was not the surgery disclosed; and all other conduct detailed in the documents I reviewed.

66. WCMC, UC Health and CAST's motive for their actions and inactions towards Dr. Durrani was financial gain.

67. The MEC, administration and Boards of WCMC and UC Health failed to "govern the affairs of the Medical Staff."

68. The MEC, administration and Boards of WCMC and UC Health failed to enforce their rules upon Dr. Durrani as they were required to do.

69. The MEC, administration and Boards of WCMC and UC Health failed to provide oversight of Dr. Durrani as they were required to do.

70. The MEC, administration and Boards of WCMC and UC Health failed to properly evaluate Dr. Durrani.

6

71. The Orthopedic and Surgery Departments abdicated their responsibility under the MEC bylaws to review, investigate and supervise Dr. Durrani.

72. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline Dr. Durrani including summary suspensions and revocation.

73. The MEC, administration and Boards of WCMC and UC Health failed to properly discipline under the MEC bylaws as it pertains to Dr. Durrani.

74. The MEC, administration and Boards of WCMC and UC Health ignored the information readily available pertaining to Dr. Durrani before credentialing and granting him privileges.

75. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's disruptive behavior, unprofessional behavior and clinical performance placing Plaintiff at risk.

76. The MEC, administration and Boards of WCMC and UC Health certified and approved the unnecessary procedures of Dr. Durrani on Plaintiff knowing they were unnecessary and knowingly allowing the improper use of BMP-2 and/or PureGen and knowing there was not proper informed consent.

77. The MEC, administration and Boards of WCMC and UC Health failed to act on Dr. Durrani's failure in medical record documentation.

78. The MEC, administration and Boards of WCMC and UC Health failed to require Dr. Durrani to follow the rules for off label experimental procedures.

79. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to use undisclosed and unqualified surgeons to perform his surgeries including Dr. Shanti.

80. The MEC, administration and Boards of WCMC and UC Health allowed Dr. Durrani to do multiple surgeries at once.

81. WCMC and UC Health have refused to provide as privileged the peer review information from WCMC for Dr. Durrani to either me or their own expert. Therefore, we have no knowledge of what action, if any, was taken against him. However, based upon the facts here, it is obvious they failed to take action.

82. Based upon all of the above, it's my opinion that WCMC and UC Health were negligent in their credentialing, supervising, disciplining and retaining Dr. Durrani on staff and allowing him to obtain and keep privileges at WCMC

7

under the standards of Ohio as detailed in the Brenda Shell's Response to
Motion for Summary Judgment and this proximately caused harm to Plaintiff.

AFFIANT SAYETH FURTHER NOT

_____
KEITH D. WILKEY, M.D.

## NOTARY

SUBSCRIBED, SWORN TO AND ACKNOWLEDGED before me, a Notary Public, by

Keith D. Wilkey, M.D. on this ___2___ day of *November*, 2015.

_____
NOTARY PUBLIC
My Commission Exp.: 07/18/2019

*St Charles* County

State of *Missouri*

ANGELA POINSETT
Notary Public - Notary Seal
State of Missouri, St Charles County
Commission # 15133613
My Commission Expires Jul 18, 2019

8